### Mather *v.* Mather, Appellant (No. 1).

Argued October 8, 1940.

Before KELLER, P. J.,
CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES
and HIRT, JJ.

*C. Brewster Rhoads,* with him *George F. Lowenthal,*
for appellant.

*George S. Wolbert,* for appellee.

OPINION BY CUNNINGHAM, J., February 28, 1941:
There are a number of unusual features involved in
the divorce proceeding in which we are now required
to reach and state our independent judgment upon its
merits. The libellant, thirty-eight and the respondent
thirty-six years of age, respectively, are persons of edu-
cation and refinement. Libellant is a lawyer of excel-
lent standing in his profession; respondent taught school
several years under a certificate from Drexel Institute.

Both expressed themselves clearly, neither displayed any hostility toward the other, but their testimony upon the vital points of the case is so conflicting as to render the drawing of correct inferences therefrom a delicate and difficult duty and to cast some shadow of a doubt upon the accuracy of a conclusion either way.

It is regrettable from the standpoint of the Commonwealth, the third party to every contract of marriage, that this one was not more successful.

Prior to their marriage on October 27, 1927, they had been next door neighbors—the parents of libellant living at No. 328 Riverview Avenue, Drexel Hill, Delaware County, and respondent's parents at No. 326. At the date of their wedding libellant was employed at Harrisburg in a legal capacity with the then Public Service Commission of the Commonwealth.

Shortly after their marriage they went to housekeeping in a semi-bungalow in Penbrook, a suburb of Harrisburg, and in May, 1929, purchased a home in Camp Hill, another suburb. That home was sold in 1930 and they were living in an apartment on Maclay Street, Harrisburg, in 1932.

In his libel in divorce, filed May 5, 1937, libellant charged respondent with having "committed wilful and malicious desertion, and absence from his [habitation], ...... without a reasonable cause, for and during the term and space of two years," within the intendment of Section 10 of The Divorce Law of May 2, 1929, P. L. 1237, 23 PS §10. The date laid in the libel, as of which the desertion is alleged to have occurred, was December 16, 1934.

The desertion here involved was not, however, a departure of respondent on that date from their common domicile, but a constructive desertion by reason of the failure of respondent to comply with libellant's request that she return to Harrisburg from her parents' home and there live with him as his wife, which request had

been repeatedly made and finally insisted upon on December 16, 1934. In her answer respondent denied she had deserted libellant within the meaning of the statute or absented herself from their home "without reasonable cause."

In this connection it may be noted that there is not the slightest suggestion in this record that libellant had been guilty of any conduct which would entitle respondent to a divorce from him and, therefore, justify her failure to return to him.

As it was not controverted under the evidence that the demand was made by libellant, and made in good faith, and as it was admitted respondent never resumed marital relations with him, the issue before the master and in the court below was whether or not respondent established by the fair weight of the evidence a "reasonable cause" for her rejection of libellant's request when made and persisted in such constructive desertion for a period of two years after December 16, 1934.

On September 29, 1937, William Y. C. Anderson, Esq. was appointed master; after holding a number of meetings he resigned on May 6, 1938; thereupon, Daniel G. Murphy, Esq. was appointed in his stead on July 14, 1938, and by direction of the court proceeded de novo. Fifteen meetings were held at which testimony and exhibits occupying 545 pages of the printed record were received.

The case was well and fairly tried upon both sides before the master and ably presented to us. A comprehensive report was filed by the master in which he recommended the granting of a decree of absolute divorce. Numerous exceptions were filed to his report; in an opinion, written for the court below by SMITH, P. J., and reviewing and analyzing the testimony, the exceptions were dismissed. The present appeal is by the respondent from the final decree entered April 22, 1940.

As the *cause* assigned by respondent for her refusal to

accede to libellant's request that she return to Harrisburg with him and become (as he described it) a "full time" wife there, rather than a "week-end" wife at Drexel Hill, was illness and her inability to secure permission from her physician, Dr. James J. Waygood, to return to housekeeping with libellant at his place of employment, it is necessary to give a brief sketch of the background of the case.

The first years of the married life of the parties seem to have been entirely normal and happy, but in the latter part of 1929 respondent, unfortunately for both, fell into a mental state of depression—a functional mental disease technically diagnosed by Dr. Waygood as "a depression of the manic-depressive type."

Several recurrences required treatment in hospitals and in May 1931 she came for the first time to Dr. Waygood's private sanitarium, Roseneath Farms, in Germantown. In general, Dr. Waygood described her illness as a mental one in which a period of depression is followed by one of high activity. In his language, respondent during a period of depression felt "an inability to carry out her duties, being undecided about things in general and not knowing what to say to people—not wanting to see them—in other words, feeling entirely inadequate with a sense of depression."

One of these depressions occurred in October 1932, while they were living in an apartment on Maclay Street in Harrisburg. It is at this point the history of the case really begins. An incident occurred, however, in January 1930, to which reference should be made as casting some light upon subsequent events. They were then living in their own house in Camp Hill. When libellant came home on the evening of January 9th he found the house dark and a note addressed to him by respondent, the material portions of which read: "I have gone home to stay. Please do not try to see me as I *do not wish to see you.* This is no whim, it is final. We will perhaps have to talk later on about household

or business matters. That can be done over the phone. ...... When I get home I will phone your mother & tell her I have left you, and perhaps she will come up."

Respondent and her mother later removed the furniture from the house and libellant took a room in the Payne home on North 13th Street, Harrisburg. As a reconciliation followed about Easter of that year and the parties renewed cohabitation at the Payne's, the letter was admitted not as substantive evidence but as tending to affect the credibility of some of respondent's later testimony in that it contains no reference to any illness at that time. In September of 1930 the parties took up housekeeping on Maclay Street.

When respondent suffered the above mentioned depression in October 1932, libellant brought her in his car to consult Dr. Waygood at Roseneath Farms. The latter advised that she stay there. Libellant consented and returned to Harrisburg. When it became apparent that respondent's treatment would be prolonged, libellant again took a room at Payne's where he lived until his connection with the Public Service Commission terminated. Respondent was under treatment at Roseneath Farms until February 1934. During this period from October 1932 to February 1934, libellant came to Drexel Hill practically every week-end, frequently took respondent to places of entertainment, and had her with him Saturday and Sunday nights at his parents' home, where they had lived for a short time after their marriage.

During this period, and former periods when respondent was ill, libellant, in the language of the master, "was entirely sympathetic with her condition, did everything within his power to restore her health, agreed to every plan suggested to effect her recovery, cheerfully paid substantial portions of her medical and nursing expenses, acquiesced in her being physically separated from him and away from their home for

treatment, visited her over week-ends, and in all ways did everything for her within his power."

In February 1934, respondent went with her parents and a nurse to Florida returning to Roseneath Farms in April, where she remained until July and then left permanently, going to a camp in Vermont. Libellant met her in Washington upon her return from Florida, spent three or four days with her there, and the first ten days of August at the camp. About Labor Day respondent returned to her home at Drexel Hill. During her visit in Florida respondent engaged in the usual recreations, swimming, golfing, walking, dancing, sailing, sketching, attending the movies and baseball games.

Libellant testified that upon her return "she was completely out of any depression" and her physical condition "was quite good." Referring to the same time, Dr. Waygood, testified: "She appeared to be active and interested in things, but at the same time I found her rather wilful and dictatorial."

Upon her return from camp libellant began suggesting that she return to Harrisburg and resume her domestic duties. At the suggestion of Dr. Waygood, however, he did not press the matter at that time. The reason assigned by Dr. Waygood was that other depressions had come on in the fall of the year and he thought it advisable to postpone the issue until after Thanksgiving. Libellant adopted the suggestion and waited until December. In the meantime respondent had again entered Drexel Institute—living with her parents during the week and with libellant at the home of his parents over the week-ends.

It is clear, under all the evidence, that by the week-end of December 9, 1934, libellant honestly believed respondent was fully able, mentally and physically, to resume housekeeping with him at Harrisburg and accordingly began to insist that she return to him.

The crucial issue in the case is whether the reason

assigned by her for her refusal—ill health and inability to secure Dr. Waygood's permission—was given in sincerity and good faith, or was a subterfuge to cloak what libellant asserts was her real reason—a desire to be free to pursue a career in art through being maintained by libellant at the home of her parents and having no domestic duties or responsibilities.

Interwoven with this issue is the question whether or not respondent's mental condition was such in December 1934, and during the succeeding two years that she was competent, from a legal point of view, to commit the offense of deserting her husband and persisting therein for the specified period.

Upon this question Dr. Waygood testified: "Q. Was Mrs. Mather depressed on the last stay at Roseneath between April 1934 and July 1934? A. No, sir. Q. As a matter of fact she came and went mostly as she pleased, did she not? A. She may have endeavored to do so. Q. Did she not leave there at times without your consent? A. She did. Q. She did other things without your consent, did she not? A. Yes. ...... Q. What was her capability of anything—to do any specific thing in December 1934? A. In the fall of 1934 or in December 1934? Q. In December 1934? A. She was very much improved at that time. She certainly could make up her mind at that time to do 'most anything she wanted to. I merely questioned her judgment at that time. Q. But she was sufficiently recovered at that time to make up her mind to do what she wanted to do? A. I think I can agree with you in that."

. The testimony of the parties upon the main issue is extremely conflicting. Beginning with the return of respondent from Florida libellant's version reads: "She had big ideas of what she was going to do in art—in the way of a career, and if I interfered with them so much the worse for me. That continued through 1934. Q. Did that begin in April 1934? A. No sir, I would not say that, but it became very much more pronounced.

She had ideas of a career in art before she was married."

Coming down to December 9, 1934, his testimony continued: "I was insisting upon her returning to live with me, to make a home for me at the close of the term at Drexel Institute during the Christmas holidays. She had told me she was not going to do that—she was not sure she would go back to Drexel for another term. . . . . . . She said, 'You know I have never been happy keeping house and that I have too much artistic ability to waste it doing that; I do not see why you think I am foolish enough to want to go back to housekeeping' or 'I do not see why you are foolish enough to think I will go back to housekeeping.' Q. What did you reply to that? A. I replied I recognized she had some artistic ability, and I did not want to interfere with it, but if she was going to be my wife she should live with me where my bread and butter was, and I was not content having a wife only over week-ends, who did not think enough of me not to live with me all the time, and I did not consent to her living in Drexel Hill any longer. . . . . . . I am quite positive that she gave me no definite answer at that time. She rather left it—she told me what she was still thinking of doing, but she gave no definite answer. I came to Drexel Hill the following week-end, December 16th again, and in walking around Drexel Hill the question came up the second time. . . . . . . I was insisting on her returning to me and making a home for me, being more of a companion and not just a week-end wife. She at that time was much more positive that she wanted something more in life than being merely a housekeeper for somebody else, and didn't want to come back at this time at least. I then stated to Mrs. Mather that she had been making some remarks to various people that she had a good natured husband that came to Drexel Hill and took her out week-ends to dances and out to dinner, and so forth, and she had a free foot during the week, and why

should she go back to keeping house for any man under such circumstances. Q. You told her? A. I told her that I had heard such stories from people she had said it to. She at first denied it, but when I gave her specifically when and with whom it occurred she admitted it and made the statement, 'Well, what of it, what if I did; you know I never was happy keeping house for you, and I am happy now, and I do not see why you should be foolish enough to think I would ever go back to keeping house for you or anybody else, and I do not intend to do it'."

Upon libellant's return to Harrisburg, he received a note from respondent asking whether he was coming down the next Friday. On December 14, respondent had, without consulting libellant, taken a position as an extra clerk in Lit's Department Store where she worked until December 24th. In the note she asked libellant whether he could meet her there. Libellant replied by a letter, dated December 21st and reading:

"Your note was something of a surprise as I had not expected to hear from you. What I said to you last week-end—and likewise the week before—was the result of considerable thought on my part and I meant all I said. Since I must be in Harrisburg most of the time because my work is here, I expect my wife to be here, too, and be with me. If you desire to retain that status I should think you would want to be here with me. I will not consent to your remaining in Philly or that vicinity, nor will I acquiesce in your insistence on doing so. After your statement that you had decided not to return to Harrisburg to stay with me, you should not expect the situation otherwise to remain as heretofore, and to have me available to take you places and call for you. If on the other hand you change your mind and decide to come and live with me here I will be glad to have you do so, and we can stay at Payne's or at Catherine Lippincott's until you can choose a suitable apartment."

Following the refusal of respondent on December 16th to return, libellant discontinued her allowance. Various meetings and discussions occurred between the parties which need not here be related in detail. The final discussion took place about the middle of June 1935. By that time a change of administration had taken place at Harrisburg; libellant had resigned his position there and had become a member of the legal staff of the Bell Telephone Company. Upon his return to Philadelphia he established his present residence in an apartment at Wynnewood Hall, No. 6318 City Line Avenue. The final interview was at libellant's office in the Bell Telephone Building. Libellant's version reads: "Q. What was said by her to you and what was said by you to her? A. She came into my office and stated that she was on her way to her lawyer's office, and if I was not going to support her willingly I was going to be made to do it, and she had been advised that she could make me do it, however, she was going to give me one more chance before she took me into court. Q. What did you reply to that? A. I replied that whether I supported her or not—willingly or unwillingly, it was a question of what she would do as to being willing to live with me. That the question of support was a corollary to that, and not an issue in itself, as I told her before. The conversation lasted quite some time I would say again an hour to an hour and a half. I was asking her wouldn't she come back and live with me seven days a week, and she was asking me what I would agree to do and to promise if she did come back. Again there were approximately three things, which I outlined before—she wanted complete freedom from restraint—from managing the home as well as the physical work of running it; I was to assure her she was to have complete freedom for any art lessons or art work that she wanted, and that included ability to go to other cities to get it or to do it. There was also the idea that I was to assist her in filling in her time.

600

...... At this [discussion] it was the complete freedom from all household responsibilities, and restraints imposed on her time, which was the thing most emphasized. Then she expressed the purpose of the freedom was for art work, if, as and when she chose to put time on it. My reply was as before that I wanted a wife who was a full time wife and not a week-end wife; a woman who thought enough of me to live with me all the time, and I had been hoping she would see the reasonableness of that and would change her attitude of the previous winter, and I recall that I walked up and down the room a number of times, and I was in tears during the latter part of the conversation, and I remember her asking me why I felt that badly, and I said I was pretty bitterly disillusioned; that I had thought up to then there was some chance of us getting together again."

It is only fair to state that libellant did not place all the blame for the ordinary frictions which occur in married life upon respondent. An excerpt from his testimony reads: "Q. Mr. Mather, what was your conduct towards the respondent during the times you had your home together, and during the times you were in company with her?—Are you prepared to state that your conduct to her was fair, reasonable, and what a husband with your education and background, and so forth should have been? A. I would answer that question generally, yes. In so doing, however, I am conscious that I am not perfect, and I would say that my answer has to make allowance for the frailties of human nature. I think I was, within what might be called reasonable bounds, of good nature, good temper and good conduct at all times."

At the meeting before the master on October 22, 1938, libellant testified positively that respondent never made any "offer to return to live with [him] as his wife" subsequent to December 1934. His attitude toward the resumption of marital relations was thus ex-

pressed: "Q. Had she made such an offer or proffer, would you have been willing to take her back and live with her as her husband? A. I certainly would. Q. Did you at any time until after the divorce case was started, refuse to take Mrs. Mather back to live with you as her husband? A. I never did."

While under cross-examination libellant stated Dr. Waygood told him respondent had been trying to get in touch with him and testified he met her in March or April 1937. In reply to the inquiry whether he then told her he wanted a divorce libellant said: "I did not. I told her I was sick and tired of being half married and half not married and unless she came to live with me as a wife should, then and only then did I want a divorce." Libellant added that he told respondent "there was no hope of changing things as they were unless she was willing to live with [him]."

"It is, of course, the duty of a wife to live with her husband at such reasonable place which he can according to his means provide as a home. Since it is the obligation of the husband to provide a home, his choice in the matter is controlling provided it is exercised in good faith": *McDonald v. McDonald,* 108 Pa. Superior Ct. 80, 83, 164 A. 830.

Upon respondent's side of the case, her version of the circumstances surrounding her refusal on Sunday, December 16, 1934, to return to Harrisburg was that libellant "was not only urging but insisting that [she] come back—to give him an answer as to whether [she] would come back right then and there." An excerpt from her testimony reads: "Q. And your reply to that was what? A. My reply was that I would see Dr. Waygood and ask his advice about it, and I did see Dr. Waygood—I think it was on the 11th of December, and again on the 31st of December 1934." She testified she kept telling libellant during their conversations on December 9th and 16th that Dr. Waygood told her she was not well enough to go back to Harrisburg. In

reply to a question from the master, she testified: "I did not tell him that I would not come back. I told him I would have to see Dr. Waygood again. Q. But he did require of you your status coming back as his wife? A. Yes, he did." Her attitude was thus expressed: "I didn't think he was deserting me, or I was deserting him, or anything about desertion." Her explanation relative to employment at Lit's was that she desired to obtain practical experience in connection with a course she was taking in advertising. The remainder of her testimony about the events of December 9th and 16th was largely an absolute and categorical denial of the above quoted testimony of libellant, concluding with the general statement "I did not say any of that because I never said anything or thought anything about not going back." Her statement was that she had no communication with libellant between December 24, 1934 and March 5, 1935, when she wrote him the following letter: "The last time we talked you said to let you know when I was ready to come to Hbg. I think that will be early in April as my exams at school are over on March 20th. Would like to talk with you about plans the next time you come down, so will you let me know about when to expect you. Hope everything is going O. K. with you." Libellant came to Drexel Hill and they had a discussion.

The substance of respondent's testimony relative thereto was that she told libellant she had gotten Dr. Waygood's consent to go back to Harrisburg and that she was willing to live with him anywhere.

Here, again, the testimony is hopelessly conflicting. Libellant testified respondent wanted to know whether he would "provide someone who would manage the house" and relieve her from "the marketing or planning meals," so that she would be free to continue her art lessons; and that respondent never said definitely she was coming back.

Her story of the interview in libellant's office in June

1935, reads: "I told him that day that I wanted to come back and live with him, and if he would not let me come back to live with him that I had an appointment to see Mr. Lowenthal, my lawyer, about making him support me, because he had not been giving me any money since December 1934. I said, 'But I do want to come back and live with you' and that day he flatfootedly said, 'No.' I know he sat and thought for a long time and then he said, 'No'. That was the day I tried to kiss him in the office and he turned away."

Libellant in his testimony in rebuttal just as positively denied respondent's testimony to the effect that she had repeatedly offered to comply with his request that she return to him as his wife and resume the performance of her part of the duties and obligations of their contract of marriage. With the testimony of the parties thus irreconcilably conflicting, and amounting upon its face to an even balance, the factors of credibility and the presence or lack of corroboration become important.

It is to be noted, in the first place, that the testimony of Dr. Waygood, called by respondent, falls far short of supporting her contention that he would not consent in December 1934 to her return to libellant. While under examination by the master the following question was asked and answer given by Dr. Waygood: "Q. Doctor, I am particularly interested in the events of 1934. Mrs. Mather has testified that she would not return to live with her husband except with your consent; Did you take the position or advise her that she should not return to live with her husband in December 1934, except with your consent? A. I had previously to that been advising her to remain at home with her parents, and in early December 1934, as I recall, I still gave her that advice. I did not feel that she was entirely well. Mr. Mather I think saw me or wrote to me, maybe both, in the latter part of December 1934, and gave me to understand that he expected her to re-

turn to their home in Harrisburg; and on the next interview with Mrs. Mather I told her that under the circumstances I could no longer advise her as to where she should live or what she should do, that she would have to make her mind up herself. I think that covers the circumstances you asked about."

Referring to a conversation with libellant in December 1934 the witness said, "Mr. Mather made his position rather plain that he expected Mrs. Mather to return home in Harrisburg with him, and I told him at that time, because of his feelings in the matter, I had withdrawn my previous recommendations to Mrs. Mather; that I felt it was now a situation in which the doctor could no longer advise, but that Mrs. Mather would have to make up her own mind as to what she would do." The actual advice of the witness to Mrs. Mather is indicated in the following question and answer: "Q. It is a fact, is it not, Doctor, that after this conversation with Mr. Mather, and your decision to withdraw your advice, you told Mrs. Mather definitely that any choice that was to be made as to her return to Harrisburg, would have to be her own decision? A. Yes."

It was not denied by Dr. Waygood that at one of the hearings before the former master he had been asked the following question and had made the following answer: "Q. You were convinced [in December 1934] that [respondent] was of such mental strength and soundness to decide that question for herself—I want your opinion on that point, which is more or less vital? A. Mrs. Mather was perfectly well at that time, she was still seeing me on occasions, apparently looking to me for advice, on the other hand it was not necessary for the patient to accept all the doctor's advice, and I would repeat the fact that she was in the state of mind at that time in which she could very reasonably reach her own conclusions."

Again, with relation to the trip to Florida, respondent testified: "It was Dr. Waygood made me go. When

he talked with me about it I told him I did not want to go and he told me I had to go if he was going to continue the case." Dr. Waygood's testimony was that the suggestion came from the parents of respondent and he merely acquiesced in it. With reference to taking employment at Lit's, respondent testified Dr. Waygood had finally approved of such employment. His testimony was that he "advised against it."

In considering the good faith of respondent's averment that the state of her health on December 16, 1934, prevented her from acceding to libellant's request, it should be borne in mind she was then enrolled at Drexel Institute and working in a department store, and did not consult Dr. Waygood between December 11th and 31st, 1934.

There can be no question under the evidence upon this record that respondent was interested in having a career in art outside of the home. The libellant called a number of disinterested witnesses in rebuttal. Among them was Mrs. McIntyre who had been a classmate of respondent in Lansdowne High School and Penn Hall in Chambersburg and was maid of honor at her wedding. Her testimony was that respondent "was always doing sketching and painting" and had been interested in those things "when we were in high school"; that respondent had a number of things she had done and offered to sell the witness a sketch for $25. Mrs. McIntyre visited respondent and libellant on different occasions at Harrisburg and testified to a conversation with respondent in which the latter said, in effect, that "she hoped to do different things some day," rather than taking care of a home. Dr. Waygood, in referring to the treatment afforded respondent at Roseneath Farms, said: "It has been a part of her treatment to urge occupation—both what is called occupational therapy and physical activity in patients at Roseneath—that is part of what is broadly termed occupational therapy; and I had developed certain art work—both clay work-

ing, sculpture, drawing and pastel work. Even when Mrs. Mather was quite deeply depressed she was doing very good work in the drawing—pastel, I think she had one or more pictures accepted at the Academy at the exhibit that winter."

Mrs. Payne, at whose home the parties lived in Harrisburg, testified respondent had asked her about the American Association of University Women and expressed a desire to become a member. When the witness told her she would have to have a college degree to be eligible, respondent "expressed the idea that a college degree was her ambition." The witness continued: "I asked her how she was going to get a degree and have a career when she was married and had a home and the responsibilities that you have with a home, and she said she was more interested in a degree."

Another rebuttal witness was Mrs. Wallace, who testified she had known respondent since 1934 when the witness had a gift and knitting shop on Hamilton Street. Mrs. Wallace said respondent discussed her marital difficulties with her in the early part of 1935. An excerpt from her testimony reads: "She said she was not living with her husband at the time; that she was very much interested in art, and she was debating whether she should go back to her husband, and asked me what I would do in such a position. ...... Mrs. Mather said she did not like housekeeping, and she felt she had a definite career in painting, drawing and art, and she wanted to do that instead of keeping house, and she felt that keeping house kept her from building up a career. ...... She said she did not care to go back to her home if it was going to interfere with her art."

Following these witnesses respondent again took the stand and, while admitting she knew Mrs. Wallace and had had conversations with her, positively denied the statements made by that witness, as well as the state-

ments testified to by Mrs. Payne and many of those related by Mrs. McIntyre. One trouble with the respondent's case is that she denied too much.

We have not referred to the corroborative testimony of members of the respective families of the principals; they were naturally interested witnesses and their evidence is of comparatively slight assistance in disposing of the controlling issues.

Our study of the record has led us to an independent conclusion coinciding with that expressed by the court below, to the effect that the clear weight of the credible evidence is with libellant, and that respondent was not only mentally competent to decide for herself whether or not she would comply with libellant's demand, but also physically able to resume cohabitation. Her refusal to return amounted to a desertion within the meaning of the statute.

The final question—whether her continued absence from libellant's habitation was such a persistence in her desertion as is contemplated by our divorce law—has given us some concern. There is uncontradicted evidence upon the record that she suffered another depression from September 1935 to April 1937, during which she lived at home with a nurse and was visited from time to time by Dr. Waygood. His description of her mental condition during that period reads: "Her ability to come to conclusions about anything was practically in abeyance during almost all of that period. The matter of making decisions was something that was usually utterly impossible for her. The nurse, her parents and I had to make decisions for her during that period of time." There was no definite specification by the witness of the periods during which he considered her incompetent to make her own decisions, nor was the nurse called.

The original master was not appointed until September 29, 1937. There has been no adjudication of insanity, as legally recognized. We are not convinced,

608

under all the evidence, and particularly that of respondent relative to a number of meetings and discussions with libellant in March, April and May, 1937, and a trip to Florida with the nurse, that she was not competent, in the eyes of the law, to persist in the desertion which began in December 1934. If it were not for the above quoted testimony of so many disinterested witnesses that respondent was definitely more interested in her career than in being a wife, we would be more impressed with the earnest and forceful argument of her counsel relative to her mental condition. That testimony, which is ignored in their brief, also indicates that respondent's choice was made with deliberation.

By reason of the emphasis placed at the oral argument upon the fact that this case has its distressing features, no matter how decided, we have examined the record with caution as well as care and have discussed the material evidence at unusual length. That examination has led us to the conclusion that respondent's assignments of error to the decree entered against her in the court below should be dismissed. A somewhat similar case is that of *Laterza v. Laterza,* 124 Pa. Superior Ct. 103, 188 A. 89.

Decree affirmed.